MICHAEL G. PALMER
PALMER | GEORGE PLLC
923 N. 3rd Street
Coeur d'Alene, ID 83814
Telephone: (208) 665-5778
Facsimile: (208) 676-1683
Email: amber@cdalawoffice.com
ISBA# 5488

Attorney for the Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | ) Case No. 3:21 CR 305 DCN |
| Plaintiff, ) | ) |
| ) | **DEFENDANT'S SENTENCING** |
| vs. ) | **MEMORANDUM** |
| ) | |
| QAYA MIKEL GORDON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

COMES NOW, the above-named Defendant, QAYA MIKEL GORDON (hereafter "Qaya"), by and through his attorney, MICHAEL G. PALMER of the law firm of PALMER | GEORGE PLLC, CJA Appointed Counsel, and hereby submits the following memorandum in regard to sentencing in the above-referenced matter.

Defendant recommends that the Court enter a sentence of thirty-six (36) months in the custody of the Bureau of Prisons for the reasons which follow:

**DEFENDANT'S SENTENCING MEMORANDUM - 1**

**Factual Background**

Qaya Gordon, was convicted by a jury on two counts of Assault with a Deadly Weapon within Indian Country.

The presentence investigation described the general background in which Qaya grew up on the Nez Perce Reservation. To reiterate Qaya was raised by his grandparents, Teri and Jeffrey Scott. This was due to neither of his actual parents being available to raise him, as they were each deeply addicted to and continually abusing alcohol and/or illegal drugs throughout Qaya's childhood. Teri and Jeffrey Scott became the central parental figures in Qaya's life and their influence has significantly informed his choices in this case (legally, not on the night in question), more on that will be discussed below.

In the months leading up to the night of Halloween 2021 Qaya's mother, Vashti Scott, had taken up with Kyley Payne, and the two were in a relationship. Apparently, they had in common estrangement (to an extent) with their families, both were deeply addicted to methamphetamines and/or other controlled substances, and both were homeless. Indeed, the scene where the altercation between Qaya and Kyley Payne happened was in a shack that the local witnesses described as being regularly used by homeless people and drug users.

During the defense investigation of this case, family members of Qaya and Vashti Scott described a number of incidents or situations between Vashti and Kyley Payne in the months and weeks before the incident on Halloween that involved domestic violence, property offenses, and/or manipulation and other bad behavior. Vashti was usually though not always described as the victim, and Kyley was usually though not always described as the aggressor, or so believed Qaya's extended family. The criminal acts were either not reported or not acted upon (this isn't

clear), but certainly characteristic of the sort of behavior common to folks caught up in the abuse and addiction to drugs and alcohol. Those things informed their (Kyley and Vashti's) perceptions and drove behaviors they likely would not otherwise have engaged in. Accepting at face value the information presented about Kyley Payne at trial or in the presentence material, he has apparently turned things around since the Halloween incident, is now a nice person, and is clean and sober. For the sake of all involved, hopefully this is still the case. Whatever the current circumstances may be, they are not the circumstances that were in place on the night of October 31 – November 1, 2021.

Reading the official version of the case makes it appear that Qaya was angry at Kyley Payne because Kyley wasn't responding to Qaya's request that Kyley purchase beer for him. Kyley's statements amount to a denial of any willingness to do that for Qaya, who was underage (though an adult), and further indicate that such a request was a surprise as there was little-to-no relationship between the two of them. Contrary to this assertion Qaya has indicated that Kyley had no such qualms and had made a number of beer purchases for him before, so the request that he do so that day was nothing out of the ordinary. Qaya has also indicated that regardless of Kyley's willingness to purchase beer for Qaya, Kyley was inconsistent in his availability. This would certainly be in keeping with the lifestyle of someone strung out on methamphetamines, alcohol, and/or other illicit substances. Because of this Qaya was not surprised by the lack of a response from Kyley on the day of Halloween, nor was he angry with him for not making the requested beer purchase.

Qaya has maintained that he went to the shed where his mother, Vashti, and Kyley had been using as a temporary place to stay, to see his mother. His intention was to share candy with

her that he had acquired while out earlier on that evening, Halloween night. The versions of the events that followed upon Qaya's arrival are divergent and for the most part irreconcilable. Kyley indicates that Qaya came into the shack with his friend Amrin, that Amrin locked the door behind them, and that Qaya picked up a hammer and launched into an unprovoked attack on Kyley. Vashti originally told a similar version though one in which Amrin remained outside but was egging on Qaya. She subsequently recanted that and indicated that she and Kyley were in an argument (whether this was physical or not isn't clear), and that when Qaya arrived the argument expanded to include Qaya and then became physical between the two men. Qaya has similarly maintained that he arrived to find Vashti and Kyley arguing and that when he asked/told Kyley to stop with the mistreatment (verbal or otherwise) of his mother, that the argument escalated from verbal to physical between himself and Kyley.

      At trial Qaya's jury was instructed on the law of self-defense as Qaya has maintained his position that Kyley was the initial aggressor, not himself. At this point we know that the jury did not find that Qaya was lawfully acting in self-defense as they convicted him of both counts of assault. What we do not know is whether they rejected Qaya's version of the situation and adopted that of Kyley, or adopted Vashti's original assertions, or if they instead found Qaya's recitation more persuasive but nevertheless determined that his use of force was excessive to the threat presented. That distinction while immaterial for purposes of determining if the prosecution has met its burden of proof on the elements of the offense, would be helpful to know in moving forward with the case. Unfortunately, we're left to guess at this and will never know.

**Circumstances Resulting in Trial**

Normally, as defense counsel, I would not elaborate on the circumstances which resulted in a case being tried rather than settled with a plea agreement; this case is an exception to that. It is important when the Court determines what an appropriate sentence should be, to know how Qaya got here. Per normal, counsel for the prosecution and defense communicated in good faith and attempted to negotiate a resolution that both sides could live with. A tentative agreement was reached that would have resulted in a plea to one count rather than two and sentencing recommendations (accepting that the Court is independent of any agreements between the parties and could reject such) for a prison sentence significantly reduced from that in the presentence investigation and from what is expected to be made at Qaya's sentencing hearing now after trial. Qaya had accepted the agreement after long discussion about the underlying facts and the law of self-defense, including (especially) the reasonableness of the force employed in a given situation. However, frustratingly, after resolving to accept the plea agreement, Qaya had conversations with his grandparents.

As noted above and in the presentence report, Qaya's grandparents are his parents in all respects that matter. His grandparents were adamantly against Qaya accepting the plea agreement. My attempts to explain the agreement from a legal perspective were fruitless. From their perspective the entire case by the federal government against their grandson Qaya was evidence of ongoing racist and colonialist abuses of the Native Americans by the federal government. They believed (and likely still believe) that the case should never have been removed from the tribal court as all involved in the situation were enrolled members of a native American tribe. Moreover, they clearly believed that Qaya's rendition of the facts of what took

place on Halloween 2021 was the most accurate as both Vashti Scott and Kyley Payne, being illicit drug users, were not in their opinion credible.

On one hand it might be said that Qaya is an adult and his decisions are his alone to make, including the exercise of his right to trial or an election to resolve the case. That is certainly objectively correct, but it ignores the subjective reality of personal relationships that inform peoples choices. Here, Qaya's grandparents are the people he relies on for guidance and advice, they are clearly the people he most strongly trusts, and they have been his primary attachment figures and the people who raised him. Their thoughts, feelings, and opinions are of paramount importance to Qaya who, while now an adult, is still a very young man. It should not be forgotten the outburst on the part of Qaya's grandfather, Jeffrey Scott, when Qaya's verdict was read, such that Jeffrey was removed from the courtroom by court security. Jeffrey Scott was loudly expressing his belief that the verdict was the end result of racist decisions by non-native American actors (myself included) involved in Qaya's case. This demonstrated two things, first Jeffrey Scott's ongoing deep-seated beliefs about the basis for the federal government's involvement and, second, the force of personality that Jeffrey Scott has, and which was brought to bear on Qaya when Qaya informed his grandparents that he was going to accept a plea agreement. As his lawyer, I have no doubt whatsoever, that but for the pressure from Qaya's grandparents this case would not have been tried. It might well be argued that this is moot because, as noted above, Qaya is an adult and has agency of his own. Respectfully, such argument if made should be rejected as it ignores the reality that we humans are social creatures and our interpersonal relationships are ultimately the most important aspects of our lives, and the

relationship of trust and guidance that Qaya has with his grandparents resulted in his choice to have a trial rather than to resolve his charges.

## Sentencing Recommendation

With the above in mind, when the Court is considering the factors of § 3553(a) (focusing on subparts 1 and 2) and applying them to the circumstances of this case, the Court should consider the following:

1) The nature and circumstances of the offense and the history and characteristics of the defendant:

The nature and circumstances of the offense have already been acknowledged above from the perspective of the defense and are thoroughly covered in the presentence reports and the prosecution's sentencing memorandum.

Regarding the history and characteristics of the defendant, Qaya is a young adult who is going to spend at least the early years of his twenties, when others his age are gaining marketable occupational skills, in prison. Hopefully this will serve as a personal deterrent from engaging in similar conduct in the future, rather than becoming a lifelong stumbling block from which he never recovers.

2) The need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Regarding subpart (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, here it is conceded and cannot be reasonably argued that the offense is not one viewed by society as serious. A crime that involves violence, while common, is clearly one that society is not willing to tolerate. However, any sentence to the Bureau of Prisons, regardless of length, will meet the requirement of reflecting that the Court takes the charge seriously. Such sentence will promote respect for the law and will provide punishment for the offense. The question becomes how long a sentence, in this case, is the minimum to meet this goal? Put otherwise what will ultimately cause Qaya to amend his behavior and incentivize him to conform himself to the legal expectations of the community? It is respectfully suggested that a sentence in variance with the guidelines, of thirty-six (36) months can meet this goal.

Regarding subpart (B) to afford adequate deterrence to criminal conduct, the fact that a person can be arrested and prosecuted for a felony offense for which years of prison time is an available punishment should provide, in and of itself, adequate general deterrence to the commission of this type of criminal offense. The public knowledge and availability of criminal records which demonstrate that persons like Qaya will be arrested, jailed, kept in jail for approximately a year before resolution of the matter, and then be sentenced to serve a prison sentence, should be more than adequate deterrence for anyone considering using physical violence to gain the upper hand in a situation. All of which suggests that the goal of specific deterrence has been met.

Regarding subpart (C) to protect the public from further crimes of the defendant, the evidence in this matter is that the crime arose out of a perception by Qaya regarding the

**DEFENDANT'S SENTENCING MEMORANDUM - 8**

relationship and interactions between his mother and Kyley Payne, both at the time illicit drug users. Apparently, that relationship has long-since ended and, obviously, Qaya has been and will continue to be for some time, incarcerated. Only time will tell if the intended deterrence from future similar conduct has been met, but presuming so, the public will be protected.

As to subpart (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner, this is a factor that will hopefully inform the choices of the Bureau of Prisons as to where they elect to place Qaya while he is in their custody. Clearly to be successful in the future Qaya needs some kind of occupational skills, preferably beyond that of general laborer, to become a self-sufficient adult and contributing member of his community. Hopefully Qaya can be placed in a facility which will give him a start toward this goal.

The sentencing goals of § 3553 can be broadly characterized as deterrence, rehabilitation, public protection, and punishment. Of those goals, when considered against the circumstances of this case, all of these goals can be met by imposition of a thirty-six (36) month sentence. If imposed this sentence will remove Qaya from society for a period of time, but not for a lengthier a period than is necessary to meet the sentencing objectives, and hopefully not so long as to cause him to become institutionalized to the prison lifestyle. As previously discussed above, the punitive aspect of the sentence will militate in favor of confinement. However, the length of that confinement can and should be balanced against his young age, limited record, and the unique circumstances of his offense. Clearly the sentencing guidelines as calculated call for a prison sentence, this is not disputed by Qaya, but with respect, the facts and circumstances while

militating for a prison sentence do not require sentence of such severity as the guidelines have suggested.

DATED this 25th day of November, 2022.

PALMER | GEORGE PLLC

By_____
Michael G. Palmer
Attorney for Defendant

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of November, 2022, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Traci J. Whelan
Assistant United States Attorney
District of Idaho
6450 N. Mineral Drive, Suite 210
Coeur d'Alene, ID 83815

☑ CM/ECF SYSTEM
☐ U.S. MAIL
☐ TELECOPY (FAX) to: (208) 667-0814

_____
Amber D. Morris